851 So.2d 799 (2003)
Joseph Scot BARRETT, Petitioner,
v.
Kristina BARRETT, Respondent.
No. 4D03-2052.
District Court of Appeal of Florida, Fourth District.
July 25, 2003.
Jeanne C. Brady of Brady & Brady, P.A., and Steven M. Pesso of Steven M. Pesso, P.A., Boca Raton, for petitioner.
H.T. Maloney of Patterson & Maloney, Fort Lauderdale, for respondent.
KLEIN, J.
Petitioner, the father in a child custody proceeding, seeks a writ of prohibition quashing an order denying his motion to disqualify the trial judge. We conclude that the judge's cross examination of a *800 witness for the father would reasonably have caused the father to fear that he could not get a fair and impartial trial, and grant the petition.
The witness was a woman with whom the mother and her two children had lived after the father and mother were divorced. She testified that the mother had neglected the children, was often out all night, and had abused both children. After this witness, who had testified in this case on a prior occasion, was questioned by the lawyers, the court indicated that it had "a lot of questions."
One of several areas in which the court questioned this witness concerned the fact that the four year old child, the only one of this marriage, had lived with her father for an eight month period with no contact from the mother, while the mother had legal custody. The court inquired of the witness:
THE COURT: And do you know how long the children were not allowed to see their mother? Do you know how long there was an interference with the mother's visitation and custody?
THE WITNESS: Best I remember, this happened February I want to say and then 
THE COURT: February 23rd, 2000.
THE WITNESS:  okay, and then it was June when she got the children back. But I don't think she was not allowed to see them. I think it was  I think it just didn't happen more than it wasn't allowed.
THE COURT: Were there allegations that the former husband used drugs and beat the children?
THE WITNESS: I heard those stories, yes.
THE COURT: And were there allegations that the husband interfered with her custody of her child by a former relationship and that would have been Harmony because he wasn't Harmony's father, was he?
* * *
THE COURT: Do you know what allegations he made in order to get custody of the children?
THE WITNESS: No. No, no, I didn't.
THE COURT: Did you realize that she wasn't able to have her children because of his allegations?
* * *
THE COURT: Are you aware he's been substantially in arrears in child support since that last time?
THE WITNESS: No, no, I have no idea.
THE COURT: And that in fact he is in arrearage of $4590 in child support?
THE WITNESS: No, I didn't know. No. I'm only a concerned  I'm more concerned about the way the children will be raised than I am about their financial situation.
THE COURT: I am too.
* * *
THE COURT: So do you know how long she was prohibited from being around her infant daughter?
THE WITNESS: Well, it must have been from February to June.
THE COURT: No contact from February 23rd till June 28, four months 
THE WITNESS: Okay.
THE COURT:  for an infant not to be allowed to be near her mother. Are you aware of that?
The father and mother were married when the mother was eighteen and divorced when the mother was twenty-two.
*801 During those years the mother had lived much of the time in the witness's home because of financial problems. The court asked:
THE COURT: Well, she was married to him. He couldn't afford her. So what was to happen with her and the two babies? What was she supposed to do?
* * *
THE COURT: Did you know that he [the father] told the hearing officer that he didn't know where she lived and he hadn't seen his child and he didn't know where his child was? Did you know that?
THE WITNESS: No, I didn't.
THE COURT: And did you know that as soon as he got the order, he went directly to her house and picked up the child? Did you know that?
THE WITNESS: No. I know that he was given the order that he could go pick her up.
THE COURT: Did you know she had a hearing set and it was part of the court file for his failure to support with her accurate address in the court file?
THE WITNESS: I don't know these things, Judge.
THE COURT: Well, those are things that I found out through a lot of investigation, certainly wasn't what Mr. Barrett told me.
MR. KORMAN: Your information is incorrect because I know what he went through to find her.
THE COURT: Well, sir, he admitted in this courtroom that he had received a notice of hearing from her that he was copied in the court file with her accurate address, with the address that he went to pick up the baby.
MR. KORMAN: He found that address a week prior to picking up the child.
THE COURT: He didn't notify her at that address.
MR. KORMAN: Oh, he may not have.
THE COURT: And therefore, it was a fraudulent hearing because if you don't notify the person on the other side and you do know the address, you are committing a fraud on the Court. And I think everybody in this room needs to know that.
The court's examination of this witness went beyond that of a neutral arbiter seeking information, and into the impermissible role of an advocate. Blackpool Assocs., Ltd. v. SM-106, Ltd., 839 So.2d 837 (Fla. 4th DCA 2003); Cammarata v. Jones, 763 So.2d 552 (Fla. 4th DCA 2000); Chastine v. Broome, 629 So.2d 293 (Fla. 4th DCA 1993). We therefore grant the petition and quash the order denying disqualification.
WARNER and GROSS, JJ., concur.